## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| UNIVERSAL MARKETING, INC., | : | |
| | : | |
| Debtor | : | Bky. No. 09-15404 ELF |
| _____ | : | |
| | : | |
| CHARLES R. GOLDSTEIN, Chapter 7 Trustee | : | |
| for the Estate of Universal Marketing, Inc., et al., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Adv. No. 11-0696 |
| v. | : | |
| | : | |
| STARNET CAPITAL GROUP, LLC, | : | |
| | : | |
| Defendant. | : | |

# M E M O R A N D U M

## I. INTRODUCTION

Within the nine (9) month period before filing its bankruptcy case, Universal Marketing,

Inc. ("the Debtor") made seven (7) transfers of $25,000.00 (totaling $175,000.00) to Starnet

Capital Group, LLC ("Starnet"). Two (2) of the transfers, totaling $50,000.00, occurred within

ninety (90) days of the bankruptcy filing ("the preference period").

In this adversary proceeding, Charles R. Goldstein, the Chapter 7 Trustee ("the

Trustee"),[1] seeks to set aside the $175,000.00 in pre-petition transfers as fraudulent transfers

pursuant to 11 U.S.C. §§544, 548 and 550. If not set aside as fraudulent transfers, the Trustee

---

[1]      The Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy
Code on July 23, 2009. By Order dated August 18, 2009, the case was converted to chapter 7.

seeks to avoid the final two (2) transfers as preferences under 11 U.S.C. §§547(b), 550.

Both parties have filed motions for summary judgment ("the Starnet Motion" and "the Trustee Motion," respectively).[2]

On May 21, 2012 ("the May 21st Order") (Doc. # 62), I entered an order that partially resolved the cross-motions.  The May 21st Order:

    (1)  entered judgment in Starnet's favor and against the Trustee on the Trustee's §§544 and 548 fraudulent transfer claims; and

    (2)  deferred a ruling on the Trustee's §547(b) preference claim pending completion of further, targeted discovery.[3]

The remaining dispute between the parties centers primarily on whether Starnet has established an affirmative defense to the preference claim – specifically, whether Starnet has proven that the two (2) transfers at issue were made "in the ordinary course of business," see 11 U.S.C. §547(c)(2)(A), and therefore, are not avoidable.

As explained more fully below, I conclude that there are no material issues of fact in dispute and, as a matter of law, Starnet is entitled to invoke the §547(c)(2)(A) affirmative defense.  Therefore, I will enter judgment in Starnet's favor on all remaining claims asserted by

---

    [2]    The Trustee's Motion sought partial summary judgment on only the §547 preference claim.  (See Doc. #'s 40, 49).  The Starnet Motion requested judgment in its favor on all of the Trustee's claims.  (See Doc. # 46).

    [3]    The May 21st Order also authorized the parties to supplement their prior summary judgment submissions after the completion of that discovery.  On July 23, 2012, in accordance with the May 21st Order, Starnet submitted the Affidavit of Jeffery Dykstra, the managing member and sole employee of Starnet ("the Dykstra Affidavit") and the Trustee filed a "letter-brief."

the Trustee.[4]

## II.  STATEMENT OF UNDISPUTED FACTS

The following material facts are not in dispute.

The relationship between the Debtor and Starnet commenced on December 1, 2008, less than one (1) year prior to the bankruptcy filing, when the Debtor executed an agreement with Starnet: the "Engagement Letter."  (See Starnet Motion, Ex. B) (Doc. # 46-2).  According to the Engagement Letter, the Debtor retained Starnet to provide, inter alia, financial and investment advisory services.  (Id. at 1; Trustee Mem. of Law in Support of Partial S.J. at 6; Starnet's Resp. at 1).  The Debtor made an initial payment of $25,000.00 to Starnet upon execution of the Engagement Letter, as provided therein.  The Engagement Letter also obligated the Debtor to make monthly payments of $25,000.00 to Starnet on the first of every month.  (Starnet Motion, Ex. B at 2).

The Debtor made seven (7) payments to Starnet prior to its bankruptcy filing.  All of the payments were made by check.  The date of each check, varied from each month.  However, Starnet did not regularly receive the payments promptly after the dates of the checks.  Rather, Starnet "routinely received the checks between one to three weeks after the so-called payment

---

[4]        Based on his expected success on the transfer avoidance claims, the Trustee also asserted two (2) derivative claims in the adversary complaint: (1) for disallowance of any Starnet proof of claim, pursuant to 11 U.S.C. §§502(d) and (j); and (2) for recovery of attorneys' fees and costs.  Because all of the Trustee's foundational avoidance claims have failed, I also will enter judgment in Starnet's favor on these two (2) derivative claims.

date." (Dykstra Affidavit ¶¶ 16-17) (Doc. # 65).[5]  Starnet then deposited each check that he

received "on the day of receipt."  (Id. ¶¶18-19).

  The tables below summarize the sequence for each payment, from due date to the date

Starnet received each payment.

### Table 1

| Due Date | Date of Check | Date Check Received (per Dykstra Affidavit) | Date Payment Cleared Bank |
|---|---|---|---|
| 12/1/08 | 12/2/08 | 12/10/08 | 12/11/08 |
| 1/1/2009 | 1/7/09 | 1/21/09 | 1/22/09 |
| 2/1/09 | 2/4/09 | 2/12/09 | 2/13/09 |
| 3/1/09 | 3/6/09 | 3/23/09 | 3/24/09 |
| 4/1/09 | 4/7/09 | 4/14/09 | 4/15/09 |
|  |  |  |  |
| 5/1/09 | 5/14/09 | 5/22/09 | 5/26/09 |
| 6/1/09 | 6/3/09 | 6/18/09 | 6/18/09 |

---

[5] In his letter-brief (Doc. # 67), the Trustee requested that I disregard the Dykstra Affidavit on the ostensible ground that the May 21st Order provided only for additional briefing, not the submission of additional evidence.  This is incorrect.  Paragraph 2.a.(2) of the Order expressly authorized the parties to submit "additional evidentiary matter."

  Also, I conclude that the disparity between the dates on the checks themselves and Starnet's evidence that the checks were received well after those dates does not create an issue of fact. The Trustee has presented no evidence regarding the Debtor's regular business practices with respect to the issuance of its accounts payable checks and without such evidence, there is no basis in the record to find that the dates of the checks correspond with their actual "issuance" (i.e., delivery to Starnet).  This leaves the Dykstra Affidavit as the only unrebutted evidence on the issue.

**Table 2**

| Number of Days Between Due Date and Date of Check | Number of Days Between Due Date and Receipt (per Dykstra Affidavit) | Number of Days Between Due Date and Date Payment Cleared Bank | Number of Days Between Date of Check and Date Payment Cleared Bank |
|:---:|:---:|:---:|:---:|
| 1 | 9 | 10 | 9 |
| 6 | 20 | 21 | 15 |
| 3 | 11 | 12 | 9 |
| 5 | 22 | 23 | 18 |
| 6 | 13 | 14 | 8 |
| | | | |
| 13 | 21 | 25 | 12 |
| 2 | 17 | 17 | 15 |

# III.  SUMMARY JUDGMENT STANDARD

Summary judgment should be granted when the moving party demonstrates "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[6]

Under Rule 56, the moving party is entitled to judgment as a matter of law if the court finds that the motion alleges facts which, if proven at trial, would require a directed verdict in favor of the movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). "[I]t is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law." United States v. Donovan, 661 F.3d 174, 185 (3d Cir.

---

[6]        Rule 56 is made applicable to this adversary proceeding by Fed. R. Bankr. P. 7056.

2011) (quoting El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007)).  If the moving

party meets its initial burden, the responding party may not rest on the pleadings, but must

designate specific factual averments through the use of affidavits or other permissible

evidentiary material which demonstrate a genuine issue of material fact to be resolved at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 247-50 (1986).    The court's role is not to weigh the evidence, but to determine whether

there is a disputed, material fact for resolution at trial.  Anderson, 477 U.S. at 249.  A genuine

issue of material fact is one in which sufficient evidence exists that would permit a reasonable

fact finder to return a verdict for the non-moving party.  Id. at 248.  On the other hand, if it

appears that the evidence "is so one-sided that one party must prevail as a matter of law," the

court should enter judgment in that party's favor.  Id. at 252.  In evaluating the record, the

court must view the underlying facts and make all reasonable inferences therefrom in the light

most favorable to the party opposing the motion.  Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d

231, 236 (3d Cir. 1995); United States v. 717 South Woodward St., 2 F.3d 529, 533 (3d Cir.

1993).

        A party's burden of proof plays an essential role in determining the merits of a

summary judgment motion.  Where the movant has the burden of proof at trial, the movant

must show that no reasonable jury could find for the non-moving party.  Fitzpatrick, 2 F.3d at

1115.  The movant "must produce enough evidence to justify a directed verdict in its favor in

order to meet its initial burden."  Nat'l State Bank v. Fed. Reserve Bank of New York, 979

F.2d 1579, 1582 (3d Cir. 1992); see also In re Newman, 304 BR. 188, 193 (Bankr. E.D. Pa.

2002).

Here, both the Trustee and Starnet are movants and carry a similar burden on their respective motions. The Trustee has the burden of proving the avoidability of the transfers under §547(b), while Starnet has the burden of proving the nonavoidability of the transfers under §547(c). See 11 U.S.C. §547(g).

Thus, on these cross-motions for summary judgment, in which a §547(c) defense is at issue, the Trustee will prevail if:

> (1) he meets his burden of establishing that there are no material issues of disputed fact and the undisputed facts prove every element of the claim under §547(b); and
>
> (2) (a) Starnet has not come forward with evidence in support of any element of its §547(c) defense **or**
>
> (b) the undisputed facts establish that the defense is without merit as a matter of law.

Conversely, Starnet will prevail if either:

> (1) the Trustee has not come forward with evidence in support of any element of its §547(b) claim or
>
> (2) Starnet has met its burden of establishing that there are no material issues of disputed fact and the undisputed facts prove every element of the §547(c) defense.

See El v. SEPTA, 479 F.3d 232, 237 (3d Cir. 2007); In re Archway Cookies, 435 B.R. 234, 240 (Bankr. D. Del. 2010); In re The IT Group, Inc., 359 B.R. 97, 99 (Bankr. D. Del. 2006).

## IV.  DISCUSSION

### A.  Introduction

The Trustee's preference claim is based upon the two (2) payments the Debtor made to

7

Starnet on May 14, 2009 ("the May Payment") and June 3, 2009 ("the June Payment")

(collectively, "the May and June Payments").  Under 11 U.S.C. § 547(b), which provides that

the trustee may avoid any transfer of a debtor's interest in property:

> (1)  to or for the benefit of a creditor;
>
> (2)  for or on account of an antecedent debt;
>
> (3)  made while the debtor was insolvent;
>
> (4)  made on or within 90 days before the date of the filing of the petition;
>
> (5)  that enables the creditor to receive more than it would receive if
>
>> (A)  the case were a case under chapter 7;
>>
>> (B)  the transfer had not been made; and
>>
>> (C)  such creditor received payment of such debt to the extent provided
>> by the provisions of title 11.

Starnet contends that the Trustee has not presented evidence in support of the third and

fifth elements of the §547(b) claim and therefore, has not met his evidentiary burden under

Rule 56.

Starnet also asserts that it has an affirmative defense to the Trustee's claim under 11

U.S.C. §547(c)(2)(A).[7]  That provision states:

---

[7]    Starnet neglected to plead the §547(c)((2) "ordinary course" defense in its Answer to the Complaint.  In pressing his Motion for Summary Judgment, the Trustee initially argued that Starnet was barred from raising the defense due to its failure to plead it.  However, Starnet filed a Motion to Amend Answer to Assert Additional Affirmative Defense ("the Motion to Amend").  I granted the Motion to Amend over the Trustee's objection while the cross motions for summary judgment have been pending. (See Doc. # 62).  Therefore, the Trustee's argument on this point is moot.

(c) The trustee may not avoid.... a transfer —

\* \* \*

(2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was —

(A)   made in the ordinary course of business or financial affairs of the debtor and the transferee; or

(B)   made according to ordinary business terms[.]

11 U.S.C. § 547(c)(2).

For the purposes of Starnet's Motion, I will assume <u>arguendo</u> that the Trustee has established a <u>prima facie</u> case under 11 U.S.C. §547(b) and therefore, will not address Starnet's initial legal argument.  As for Starnet's second argument, as explained below, I conclude that Starnet has proven its affirmative defense based on the undisputed facts and that it is entitled to judgment as a matter of law.

## B.  The May and June 2009 Payments Were Made in the Ordinary Course of Business

### 1.

The ordinary course of business exception is designed to balance the interests of the debtor and creditor.  <u>In re Molded Acoustical Products, Inc.</u>, 18 F.3d 217, 219 (3d Cir. 1994). Its purpose  is "to protect recurring, customary credit transactions that are incurred and paid in the ordinary courts of business of the debtor and the debtor's transferee." 5 <u>Collier on Bankruptcy</u> ¶ 547.04[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012)

("Collier").  More specifically, "[t]he preference provisions are designed [leave undisturbed]

normal debtor-creditor relationships, but to derail unusual ones which threaten to heighten the

likelihood of the debtor filing for bankruptcy at all and [which undermine] the paramount

bankruptcy policy of the equitable treatment of creditors." Molded Acoustical Products, 18

F.3d at 224.

Whether a transfer was made in the ordinary course of business is a subjective inquiry

"calling for the Court to consider whether the transfer was ordinary between the debtor and

the creditor." In re First Jersey Securities, Inc., 180 F.3d 504, 512 (3d Cir. 1999).  "[T]he

most important thing is not that the dealings between the debtor and the allegedly favored

creditor conform to some industry norm[,] but that they conform to the norm established by

the debtor and the creditor in the period before, preferably well before, the preference period."

Molded Acoustical Products, 18 F.3d at 223 (quoting Matter of Tolona Pizza Products Corp.,

3 F.3d 1029, 1032 (7th Cir. 1993).

To demonstrate that the ordinary course of business exception applies, the creditor

must prove by a preponderance of the evidence that the a debt was incurred by the debtor in

the ordinary course of business and that the payment of that debt satisfies one (1) of the two

(2) subsections of § 547(c)(2): the payment must have been either: (a) made in the ordinary

course of business between the debtor and the transferee, **or** (b) made according to ordinary

business terms. In re Allied Carriers' Exchange, Inc., 375 B.R. 610, 615-616 n.3 (B.A.P. 10th

Cir. 2007); Archway Cookies, 435 B.R at 241; 5 Collier ¶ 547.04[2].[8]

---

[8]      Prior to the Bankruptcy Abuse and Prevention and Consumer Protection Act of 2005
("BAPCPA"), a transfer was required to be conducted **both** in the ordinary course of business between

(continued...)

The first prong of the §547(c)(2) analysis (under either subsection) addresses the circumstances in which the debt originated and requires the court to examine the degree of "normality of such incurrence in each party's business operations generally."  5 Collier ¶ 547.04[2][a][I] (citation omitted).  In evaluating the issue, the court looks to whether the debt is typical of the debtor's and creditor's business dealings and whether the debt was incurred as a part of an arms-length transaction.  See, e.g., In re Frey Mechanical Group, Inc., 446 B.R. 208, 215 (Bankr. E.D. Pa. 2011) (citing authorities).

As elaborated further in Collier:

> If the transaction from which the debt arose was not ordinary for the debtor or the transferee, then the defense will fail.  Most courts assume this requirement is met by inferring from the evidence that there was nothing "unusual" about the transactions underlying the preferential payment.

 5 Collier ¶ 547.04[2][a][I].

Here, the parties entered into an agreement, the Engagement Letter, whereby the Debtor agreed to retain the services of Starnet for financial advisory services.  The Debtor agreed to pay Starnet $25,000.00 per month for those services.  Nothing in the record suggests that there was anything unusual about the Debtor, which was operating a sophisticated product distribution business with substantial capital needs, entering into a transaction with a

---

[8](...continued)
the debtor and the transferee (subjective test) and according to ordinary business terms (objective test) in order for a creditor to successfully challenge an avoidance by the debtor.  See 5 Collier ¶ 547.04[2].  Starnet relies only on subsection §547(c)(2)(A).

professional for assistance with those needs and the Trustee does not contend otherwise.  The first requirement of §547(c) is satisfied.

Next, for purposes of analyzing a defense under §547(c)(2)(A), the court must determine if the transfer at issue was ordinary as between the debtor and the creditor.  The defendant must establish a "baseline of dealing" so that a court can compare the transfers made during the preference period and those made during the parties' prior course of dealings. Collier at ¶547.04[2][a][ii] (citation omitted).

> This baseline of dealing must be fixed at least in part during a time in which debtor's day-to-day operations were ordinary in the layman's sense of the word.  Preferably, the material period should extend back into the time before the debtor became financially distressed.

Id. (citing In re Hancock-Nelson Mercantile Co. Inc., 122 B.R. 1006 (Bankr. D. Minn. 1991)); accord In re Quad Systems Corp., 2003 WL 25947345, at *6 (Bankr. E.D. Pa. July 15, 2003).

Essentially, the court must evaluate whether the transactions both before and during the preference period were consistent.  See, e.g., In re Allegheny Health, Education and Research Foundation, 292 B.R. 68, 79 (Bankr. W.D. Pa. 2003).

Courts have relied upon the following hallmark factors in making this evaluation:

(1)   the length of time the parties have engaged in the type of dealing at issue;

(2)   whether the subject transfer was in an amount more than usually paid;

(3)   whether the payments were tendered in a manner different from previous payments;

(4)   whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt;

12

(5)  whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition.

See, e.g., In re American Home Mortg. Holdings, Inc. 476 B.R. 124, 135-36 (Bankr. D. Del. 2012); In re Pure Weight Loss, Inc., 446 B.R. 197, 205 (Bankr. E.D. Pa. 2009) (citing authorities).  "[A]ny significant alteration in any one of the factors may be sufficient to conclude that a payment was made outside the ordinary course of business."  In re Furr's Supermarkets, Inc., 373 B.R. 691, 706 (B.A.P. 10th Cir. 2007) (quoting In re Laclede Steel Co., 271 B.R. 127, 132 (B.A.P. 8th Cir. 2002)).

In comparing the conduct of the debtor and creditor during the preference period with that of the pre-preference period, litigants and courts frequently focus on what may be characterized as "timing" issues: comparing the timing of the transfers in the pre-preference period to those in the preference period.  See, e.g., Archway Cookies, 435 B.R. at 240.  If a preference payment was paid late or behind schedule, that fact alone is insufficient to definitively prove that the payment was outside of the ordinary course of business.  See In re Forklift LP Corp., 340 B.R. 735, 739 (D. Del. 2006).  Late payments may be ordinary between the parties if "the defendant can demonstrate that such payments were ordinarily made and accepted by the parties."  Quad Systems, 2003 WL 25947345 at *7 (citation omitted); accord In re Elrod Holdings Corp., 426 B.R. 106, 111 (Bankr. D. Del. 2010); see also Laclede Steel, 271 B.R. at 133 ("late payments may be ordinary between the parties, and, thus, consistent with prior practice, [but to be in the ordinary course,] the payments during the preference period must fall within the normal range of lateness").

13

When there are differences in the timing of the payments made during the preference period as compared to the pre-preference period, determining whether that difference is substantial enough to be considered outside of the ordinary course of business is a fact-specific inquiry.  E.g., J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp., 891 F.2d 66, 70 (3d Cir. 1989).  In analyzing the timing of payments, the receipt date by the creditor (delivery date) is controlling, and not the date the preference period checks "cleared" the bank account of the transferor.  See, e.g., American Home Mortg., 476 B.R. at 137-38 (citations omitted).

**2.**

In this case, the entire history between the Debtor and Starnet involved just seven (7) transfers over a period of eight (8) months prior to the filing of the bankruptcy petition. During that time, the Debtor made five (5) payments in the pre-preference period and two (2) payments during the preference period.  Thus, the relationship between the Debtor and Starnet was relatively short-lived and there is only a small window of information from which to draw upon in order to ascertain whether there was a pattern of practice that establishes a "baseline of dealing."  That said, neither party contends that the history provides an inadequate baseline of dealing.  I, too, conclude that the relatively short pre-preference period relationship does not preclude Starnet from establishing a sufficient baseline for the "ordinary course" defense under §547(c)(2)(A).  As discussed below, the transaction history is sufficient to demonstrate a general pattern of behavior in the Debtor-Starnet relationship and it is

14

unnecessary to look to supplemental evidence in order to compare the payments made during

the preference period with the pre-preference period transfers.[9]


### 3.

Not surprisingly, the parties focus on different factors in analyzing Starnet's

§547(c)(2)(A) "ordinary course" defense.

The Trustee emphasizes what he contends are discrepancies in the timing of the

payments the Debtor made to Starnet in the course of their business relationship. He argues

that while the five (5) pre-preference payments were issued (i.e., the checks were dated)

between (1) to six (6) days from the payment due date (the due date being the first of each

month), the May Payment was made thirteen (13) days after falling due, a discrepancy

sufficiently large, according to the Trustee, to rob the transfer of ordinary course status. As

for the June Payment, although the check was dated June 3, 2009, the Trustee points out that

---

[9]      I note that while analysis of the "ordinary course" defense often is based heavily on the
debtor's payment history, the payment history is not dispositive in every instance. See In re J. Allan
Steel Co., 2006 WL 6884401, at *2 (Bankr. W.D. Pa. 2006). As one court explained, a business
relationship lacking evidence of any pre-preference period history "is not per se ineligible for protection
from avoidance under section 547(c)(2)." Quad Systems Corp., 2003 WL 25947345, at *6; see also In re
Ahaza Systems, Inc., 482 F.3d 1118, 1126 (9th Cir. 2007).

        For example, in Quad Systems, the defendant was unable to provide evidence of its pre-
preference dealings with the debtor to establish a "baseline of dealing" (despite having a history of prior
dealings). Such lack of a pre-preference payment history evidence was not fatal to the defense. The court
allowed evidence of the defendant's and the debtor's business relations with third parties for purposes of
the subjective analysis. Id. at *10; accord Ahaza Systems, 482 F.3d at 1126 (quoting In re Armstrong,
231 B.R. 723, 731 (Bankr. E.D. Ark. 1999)); cf. American Home Mortg. Holdings, 476 B.R. at 136
(where the parties have a short history of dealings, the defendant is required to fill the "gap" by reference
to "industry standards"); Archway Cookies, 435 B.R. at 242 (same).

it was not negotiated until thirteen (13) days later.  Consequently, the Trustee contends that

the June Payment, too, does not constitute an ordinary course transfer as compared to the pre-

preference transfers, notwithstanding the fact that the check was dated within the one (1) to

six (6) day range found in the pre-preference period.

Starnet responds in two (2) ways.

First, Starnet asserts that indicia other than the "timing" issues raised by the Trustee

are consistent with the conclusion that the Debtor's payments to Starnet were made in the

ordinary course:

> First, the amount paid in each month was exactly the same: the amount agreed
> upon by the parties in an arms' length transaction where Universal was
> represented by independent counsel. . . .  Second, each of the payments were
> made in the same manner, by check. . . .  Third, there was no unusual action by
> either party to collect on or pay debts; rather Universal attempted to maintain
> its normal practices by paying Defendant the contractually agreed to amount. . .
> .  Finally, although the business relationship did not occur over an extensive
> period of time, the terms and conditions were fully set forth in a negotiated
> written document.

(Starnet's Br. in Supp. of Resp. to Pl.'s Mot. for Summ. J. at 10-11) (Doc. # 54-2) (citations

omitted).

Second, Starnet takes on the Trustee's timing argument directly.  Based on the Dykstra

Affidavit, Starnet contends that the late payments made during the preference period were

consistent with the pattern of late payments in the pre-preference period.  Specifically, Starnet

points out that in the pre-preference period, between ten (10) and twenty-three (23) days

passed between the due date and date the Debtor's payments cleared the bank (one (1) or two

(2) days after receipt of the payment, according to the Dykstra Affidavit).  By comparison, the

16

May Payment cleared twenty-five (25) days after it was due and the June payment cleared

seventeen (17) days after it was due.  Starnet posits that there was no significant difference in

the preference period.


**4.**

After considering the competing arguments, I find Starnet's position persuasive.

All seven (7) payments were for the same amount each month – $25,000.00.   All of

the payments were transmitted to Starnet in the same manner: by check.  There is no evidence

of unusual collection activity by Starnet in the preference period.  Nor is there any evidence

that Starnet took advantage of the Debtor's deteriorating financial condition or even was

aware of the impending bankruptcy filing.  In other words, the Trustee points to no "out of the

ordinary course" indicia other than a modest variation in the timing of the payments during

the preference period as compared to the pre-preference period.  I conclude that, as a matter of

law, the differences are insufficient to warrant a finding that the payments were out of the

ordinary course.

Each monthly payment was due the first of the month, but the Debtor never sent the

check in a timely manner.  Starnet routinely received the checks between one (1) to three (3)

weeks after the "so-called payment date."  In the pre-preference period, the lag time between

due date and receipt of payment ranged from nine (9) to twenty-two (22) days, with an

average fifteen (15) days between due date and receipt.  Thus, while there was some

inconsistency in the degree of "lateness" of the pre-preference period payments, each payment

was made and received within twenty-two (22) days of the due date.

17

The payments made within the preference period were received twenty-one (21) and seventeen (17) days after their due date, within three (3) weeks after their due date and, on average, nineteen (19) days after the due date.  This amounts to a  four (4) day difference in the average lag between the due date and receipt in comparing the payments in the preference period to the pre-preference period.  This difference does not warrant avoidance of the two (2) transfers at issue.  See, e.g., In re American Camshaft Specialties, Inc., 444 B.R. 347 (Bankr. E.D. Mich. 2011) (finding that payments received on average four (4) days later than had previously been during pre-preference period was insignificant in upholding the ordinary course defense); In re Julien Co., 157 B.R. 834, 841 (Bankr. W.D. Tenn. 1993) (finding defense where there was a "three to four day swing in the average number of days between invoice and payment" between pre-preference and preference periods).

In summary, Debtor and Starnet's relationship, while short-lived, was "relaxed."  The Debtor did not strictly adhere to the due date of the parties' agreement and Starnet appears to have acquiesced.  Each payment made by the Debtor to Starnet, both before the preference period was received within twenty-two (22) days of the due date.  This established a pattern of dealing between the parties and a consistency between the pre-preference period and preference period payments.  Absent any additional red flags (and there are none in the summary judgment record), I conclude, based on the undisputed facts, that Starnet has met its burden and proven that the two (2) payments made by the Debtor in May and June of 2009 during the preference period were made in the ordinary course of business and, pursuant to 11 U.S.C. § 547 (c)(2)(A), may not be avoided by the Trustee.

## V.  CONCLUSION

For the reasons set forth above, Starnet's Motion for Summary Judgment will be

granted, the Trustee's Motion for Summary Judgment will be denied and judgment will be

entered in favor of Starnet and against the Trustee.

Date:  **October 24, 2012**        _____

                                   **ERIC L. FRANK**
                                   **U.S. BANKRUPTCY JUDGE**